RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0094p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

GLENDA ANN SMITH,

*Plaintiff-Appellant,*

*v.*

No. 15-3336

CITY OF WYOMING, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:13-cv-00915—Timothy S. Black, District Judge.

Decided and Filed:  April 15, 2016

Before:  STRANCH, DONALD, LIPEZ,[*] Circuit Judges.

_____

### COUNSEL

**ON BRIEF:**  Glenda A. Smith, Wyoming, Ohio, for Appellant.  Gary E. Becker, Nathan B. Spencer, DINSMORE & SHOHL, LLP, Cincinnati, Ohio, for Appellees.

_____

### OPINION

_____

LIPEZ, Circuit Judge.  This case presents questions about the protections of the Fourth Amendment in the context of police entries into a private home.  Plaintiff Glenda A. Smith ("Smith") alleges violations of the U.S. Constitution and Ohio law stemming from a series of

---

[*]The Honorable Kermit V. Lipez, Circuit Judge for the United States Court of Appeals for the First Circuit, sitting by designation.

1

encounters with police officers.  Each of these encounters was precipitated by reports that Smith was impaired by alcohol or otherwise posed a threat of neglect or abuse to her minor children. On cross motions for summary judgment, the district court granted summary judgment to defendants on all claims and dismissed the case.

We affirm the judgment of the district court with regard to most of plaintiff's claims. However, with regard to two of her claims—an unlawful entry on March 9, 2012 and an unlawful arrest on April 2, 2013—we find error.  On those two claims, we vacate the grant of summary judgment for defendants and remand to the district court.

## I.

### A. Factual summary

We recount facts that are not disputed by the parties, except where otherwise noted. Smith and her husband, Joseph Johnston, divorced in February 2012.  Between that time and December 2013, Smith had four interactions with the police department of the city of Wyoming, Ohio stemming from disputes about her treatment of her daughters Tiffany and Jasmine.  The incidents took place on March 9, 2012, and April 2, May 2, and December 7, 2013.  At the time of these events, Smith's daughters were 9 to 11 years old and 13 to 15 years old respectively.

On March 9, 2012, Sergeant World and Officer Krummen visited Smith's home after the local child services agency reported that she was possibly intoxicated and unable to care for her children.  Appellees claim that a guest invited the officers to enter the home, where they saw Smith attempting to hide behind a piece of furniture and noticed her bloodshot eyes and slurred speech.  Smith denies that she was intoxicated and that the police were invited inside.  The parties agree that the encounter ended with the police arranging for the children to spend that night with their father, Joseph Johnston.

The most significant interaction between Smith and the police occurred on April 2, 2013, around midday.  Johnston called 9-1-1 after Tiffany (then 10 years old) told him on the telephone that a man whom she did not know was in Smith's house, and that his presence was making her uncomfortable.  (Her older sister Jasmine was at school.)  The man in question, Robert Chinn,

asserted in an affidavit that when he arrived at the house he was greeted by Smith and Tiffany. He said hello to Tiffany, and had a friendly interaction with her for a minute or two. He then went upstairs with Smith and was there for about 20 minutes.

Sergeant World and Officer Murphy were dispatched to Smith's home. Tiffany opened the door and the officers entered, though the parties dispute whether Tiffany consented to their entrance. She informed them that her mother and the unknown man were in an upstairs bedroom. The officers went upstairs and knocked on the bedroom door. Smith opened it, and the officers asked her to step out of the room so they could identify the man inside. Here the accounts diverge again. Smith claims that the officers asked her to tell her male friend to come out of the bedroom, and that she immediately stepped aside and ushered him out. Chinn's deposition testimony corroborates aspects of her account. He remembered the officers asking Smith to leave the bedroom only once, and confirmed that he and Smith emerged from the bedroom at the officers' request. He also corroborated Smith's assertion that she was not intoxicated at the time. The officers, by contrast, put forward the version of events depicted in Sergeant World's deposition testimony:[1] Smith and Chinn were visibly drunk, Smith did not comply with the officers' repeated requests to leave the bedroom and reveal the man inside, and she instead asked the officers a series of questions while standing in the doorway. World describes Smith as being "very slow to respond to us" and exhibiting "very slurred" speech during the encounter, and later during her arrest being "very apologetic" and "very flirtatious." The parties agree that Smith did not raise her voice, but did ask the officers what they were doing in her home, and that at one point an officer told her she might be arrested.

All agree that Officer Murphy attempted to grab Smith's hand and that she pulled it away. But Smith claims that she had stepped out of the bedroom and was standing in the hallway when she was grabbed, while Appellees aver that Officer Murphy grabbed her to pull her out of the bedroom. Sergeant World then arrested Smith for obstructing official business, handcuffed her, guided her by the arm to his police car, and eventually drove her to a local detention facility. Smith concedes that she did not complain of any pain or injury. Chinn

---

[1]Officer Murphy was not deposed. He provided a brief affidavit, of limited utility for our purposes.

showed his identification to the officers and was allowed to leave. The criminal charge against Smith was ultimately dropped.

At this point, the accusations of domestic abuse became more serious. On May 2, 2013, Tiffany called 9-1-1, saying that her mother had threatened to kill her. Sergeant Ballinger and Officer McGillis responded to Smith's home, where they followed Tiffany inside. Smith conceded to the officers that she might have made such a threat in the heat of an argument. The officers mediated the dispute between Smith and her daughter and left. On December 6, 2013, Johnston took his daughter to a police station, where he showed Officer Riggs a bruise on her head. Tiffany reported that Smith had struck her several times on the head and face. The next day, Officer Riggs visited Smith's house to discuss Tiffany's injury. Speaking to the officer at the front door, Smith denied hitting Tiffany. (Tiffany would later change her story and say that she sustained the bruise during a fight with Jasmine.) Smith claims that during the conversation she attempted to close the front door and that Riggs briefly put his foot in the door frame to prevent it from shutting. Riggs denies this.

**B. Procedural history**

The procedural history of this case is relatively straightforward. Smith, an attorney, received permission to proceed *in forma pauperis* and brought this action *pro se* in the United States District Court, filing an amended complaint on April 10, 2014. Smith's amended complaint lists fourteen causes of action, including thirteen against individual officers (Counts 1-13). She brings one cause of action against the City of Wyoming—a 42 U.S.C. § 1983 claim for failure to train and supervise (Count 14).[2] The defendants moved for summary judgment on all claims, arguing that they did not violate Smith's constitutional rights, that in the alternative the

---

[2]Smith does not clearly delineate which counts in the amended complaint are directed at which of the defendants. We construe each cause of action to be directed at only the individuals involved in the relevant events, with the exception of the failure to train or supervise claim, which necessarily is directed only at the City of Wyoming. Even if Smith intended to sue the city under all of the enumerated causes of action, she fails to allege that any bad acts were caused by a custom or practice attributable to the city, or otherwise explain the connection between the municipality and the bad acts. Any such argument is therefore waived. *See United States v. Layne*, 192 F.3d 556, 566-67 (6th Cir. 1999) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived . . . ." (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997))).

individual officers are entitled to qualified immunity, and that state law provides immunity with regard to the state law claims. Smith filed her own cross motion for summary judgment.

With the benefit of depositions and affidavits from Smith, her daughters, some of the officers involved, and others, the district court granted summary judgment for defendants on all claims. The district court found that the individual officers had committed no constitutional violations, that Smith had failed to show the existence of a municipal policy or custom linked to the alleged violations by the officers, and that they were protected by state law immunity from the claims under Ohio law. Smith appeals.

**C. Standard of review**

We review the grant of summary judgment de novo. *Clay v. Emmi*, 797 F.3d 364, 369 (6th Cir. 2015). We consider the facts in the light most favorable to Smith and draw all reasonable inferences in her favor. *Id.* Where Smith "fails to make a showing sufficient to establish the existence of an element essential to [her] case, and on which [she] will bear the burden of proof at trial," we must affirm summary judgment for defendants. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). We may affirm the judgment of the district court on other grounds, "if we proceed carefully so the party opposing summary judgment is not denied an opportunity to respond." *See Carver v. Dennis*, 104 F.3d 847, 849 (6th Cir. 1997).

We generally construe filings by *pro se* litigants liberally, *Spotts v. United States*, 429 F.3d 248, 250 (6th Cir. 2005), but not in this case. Smith, an attorney, suffered from no handicap in filing her own papers. *See Mann v. Boatright*, 477 F.3d 1140, 1148 n.4 (10th Cir. 2007) ("While we generally construe pro se pleadings liberally, the same courtesy need not be extended to licensed attorneys." (citation omitted)); *accord Ross v. Bachand*, No. 14-CV-14122, 2015 WL 4644912, at *2 (E.D. Mich. Aug. 5, 2015).

**II.**

We dispose of a number of claims on which the law clearly favors Appellees. Five of Smith's claims assert Ohio law causes of action: false arrest (Count 3), false imprisonment (Count 4), assault and battery (Count 6), intentional infliction of emotional distress (Count 7) and

defamation (Count 12). All were properly dismissed. As the district court noted, Ohio's Political Subdivision Tort Liability Act, with exceptions not relevant here, grants immunity from damages suits to "employee[s] of a political subdivision" where the relevant harm was "allegedly caused by any act or omission in connection with a governmental . . . function," and where the employees did not act "manifestly outside the scope of [their] . . . official responsibilities," or "with malicious purpose, in bad faith, or in a wanton and reckless manner." Ohio Rev. Code Ann. § 2744.03(A). The police were engaged in their official function when they committed the relevant acts—attempting to protect Smith's minor children from possible abuse or neglect—and the record discloses no evidence of bad faith or recklessness on the part of the police. They are therefore protected against suit on these state law claims. *See Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 315-16 (6th Cir. 2005) (holding that § 2744.03 protects police officers from state law claims of false arrest); *Mullins v. Cyranek*, 805 F.3d 760, 769 (6th Cir. 2015) (similar); *Chappell v. City of Cleveland*, 585 F.3d 901, 916 n.3 (6th Cir. 2009) (similar).

Smith's claim that the officers interfered with her family relationships in violation of substantive due process (Count 13) also fails as a matter of law.[3] The district court so held and granted summary judgment to the officers on this claim, relying on *Walsh v. Erie Cty. Dep't of Job & Family Servs.*, 240 F. Supp. 2d 731, 756 (N.D. Ohio 2003). We agree with the district court that the police conduct in this case did not interfere with Smith's family relationships in violation of the Constitution. The officers' actions were a far cry from those found to have violated "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child[ren]." *Santosky v. Kramer*, 455 U.S. 745, 753 (1982) (holding that severing parental rights based only on a "fair preponderance of the evidence" violated due process); *see also Moore v. City of E. Cleveland*, 431 U.S. 494 (1977) (holding that a housing ordinance unduly restricting an extended family's right to live together in a single-family home violated due process); *Stanley v. Illinois*, 405 U.S. 645 (1972) (holding that a statute

---

[3]Smith denominates this claim as a § 1983 claim based on "impermissible interference in family relationships" in violation of the Fourth and Fourteenth Amendments. The substance of her argument makes clear, however, that the Fourth Amendment is irrelevant to the claim. The claim depends on substantive due process doctrine, *see Santosky v. Kramer*, 455 U.S. 745 (1982); *Moore v. City of E. Cleveland*, 431 U.S. 494 (1977); *Stanley v. Illinois*, 405 U.S. 645 (1972), and arguably the Equal Protection Clause, *see Stanley*, 405 U.S. at 645.

automatically denying a father's parental rights upon the death of the mother, based solely on the fact that the parents were not married, violated due process and equal protection).

Plaintiff does not challenge the district court's dismissal of her sole claim against the city—brought under 42 U.S.C. § 1983 for failure to train, instruct, and supervise the officers (Count 14)—in her opening brief. That claim is therefore waived. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 403 n.18 (6th Cir. 1999) (en banc) (per curiam) (citing Fed. R. App. P. 28(a)(3) and (b)). We note, however, that the claim would fail in any event. A plaintiff seeking to establish that a municipality failed to train or supervise police officers must prove, inter alia, that "the inadequacy" of training or supervision "'was the result of the municipality's deliberate indifference.'" *Marcilis v. Twp. of Redford*, 693 F.3d 589, 605 (6th Cir. 2012) (quoting *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006)). Smith fails to make any showing that the city "ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Id.* (quoting *Plinton v. Cty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008)). Relatedly, as the district court held, the city cannot be responsible for a failure to train on the claims where Smith's rights were not violated. *See May v. Franklin Cty. Comm'rs*, 437 F.3d 579, 586 (6th Cir. 2006).[4]

## III.

Three Fourth Amendment claims thus remain: unlawful entry (i.e., illegal searches) (Count 1), unlawful arrest (i.e., illegal seizure) (Count 2), and excessive force (Count 5). Count 1 is best understood as four separate claims based on four separate incidents: the entry of police officers into Smith's home with the purported consent of the friend who opened the door on March 9, 2012; their entry with what they claim was Tiffany's consent on April 2 and May 2, 2013; and an officer allegedly placing his foot in the doorway on December 7, 2013. Count 2 is based on Smith's arrest during the April 2 encounter, and Count 5 alleges the use of excessive force during that arrest.

---

[4]Smith does not appeal the dismissals of her claims of procedural and substantive due process violations, retaliatory prosecution, or abuse of process (Counts 8-11). We note for clarity that the claim for interference with family relationships (Count 13) is separate from one she labels as a claim based on substantive due process (Count 8). In laying out the latter claim, Smith alleges in conclusory fashion that "[d]efendants' conduct . . . constitute[s] a denial of substantive due process and was shocking to the conscience or outrageous."

**A. Qualified immunity doctrine**

Though the district court granted summary judgment on the Fourth Amendment claims on a determination that no violations occurred, we find it appropriate to affirm the dismissal some of these claims on the alternative ground of qualified immunity, specifically the Count 1 claims with respect to April 2, May 2, and December 7, 2013.[5]

Qualified immunity is an affirmative defense, *see Henricks v. Pickaway Corr. Inst.*, 782 F.3d 744, 749-50 (6th Cir. 2015), shielding government officials such as police officers "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity doctrine balances "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. The defense is thought to be "ample protection to all but the plainly incompetent or those who knowingly violate the law," *Malley v. Briggs*, 475 U.S. 335, 341 (1986), given that it "avoid[s] excessive disruption of government and permit[s] the resolution of many insubstantial claims on summary judgment," *id.* (quoting *Harlow*, 457 U.S. at 818).

A court faced with a constitutional claim against a police officer under § 1983, and the officer's invocation of a qualified immunity defense, must answer two questions: (1) "whether the facts that a plaintiff has alleged" at the motion to dismiss stage "or shown" at the summary judgment stage "make out a violation of a constitutional right"; and (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson*, 555 U.S. at 232 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The first issue is whether the plaintiff has established her prima facie case for a violation of her constitutional rights. The second is whether the officer is shielded from liability even if a violation occurred.

These two questions need not be answered in sequence. Where appropriate, we may assume a constitutional violation arguendo and proceed to determine whether qualified immunity

---

[5]Both parties briefed the issue of qualified immunity.

protects the officer nonetheless. *Pearson*, 555 U.S. at 236. If immunity applies, we may affirm summary judgment for the defendant officer on a claim without deciding whether a constitutional violation occurred.

The qualified immunity question itself can be understood as a two-part analysis. *See Matalon v. Hynnes*, 806 F.3d 627, 633 (1st Cir. 2015). First, we consider "the clarity of the law at the time of the alleged civil rights violation" to determine whether the right at issue was clearly established. *Id.* (quoting *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009)). Second, we consider the specific factual circumstances known to the officer to determine whether a reasonable officer would have known that her conduct violated that right. *Id.* Overall, this analysis requires us to define the plaintiff's asserted right with specificity, and focus on the particular facts known to the officer at the time. *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam). "The relevant inquiry is whether existing precedent placed the conclusion" that the defendant violated the law "in these circumstances 'beyond debate.'" *Id*. at 309 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

**B. Unlawful entry into Smith's home**

We first consider Smith's claims that the defendant officers unlawfully entered her home on four separate occasions. The broad legal principles here are well established. "It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984) (quoting *United States v. U.S. District Court*, 407 U.S. 297, 313 (1972)). Entrance by the police into a home—which constitutes a search for Fourth Amendment purposes—is permissible only where justified by a warrant, exigent circumstances, or valid consent. *See Payton v. New York*, 445 U.S. 573, 590 (1980) (requiring a warrant in the absence of "exigent circumstances"); *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973) (noting the validity of "a search authorized by consent").

Consent may lawfully permit the police to enter even if it is not given by the occupant whose Fourth Amendment rights are at issue. A third party with a "sufficient relationship to the premises" may consent in the absence of the occupant in question. *United States v. Matlock*, 415 U.S. 164, 171 (1974) (holding that a warrantless search of a bedroom with the consent of a

person cohabiting with the defendant and claiming to be his wife did not violate defendant's Fourth Amendment rights).  A third party's "common authority" "rests [] on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched."  *Id*. at 171 n.7; *cf. Illinois v. Rodriguez*, 497 U.S. 177, 181-82 (1990) (finding no common authority where a person sometimes spent the night at the apartment but never went there when the primary occupant was not at home).  The police may also lawfully enter a home with the consent of a party who had only apparent authority to admit them, "if 'the facts available to the officer[s] at the moment [would] warrant a man of reasonable caution in the belief that [there was] consent [from a] party [that] had authority over the premises.'"  *United States v. Kimber*, 395 F. App'x 237, 243-44 (6th Cir. 2010) (alteration in original) (quoting *Rodriguez*, 497 U.S. at 188).  Even with the consent of a person with common authority, however, the police generally may not enter when another occupant of the home is physically present and expressly refuses to permit entry.  *See Georgia v. Randolph*, 547 U.S. 103, 106 (2006).

Consent to enter need not be explicit.  It "may be in the form of words, gesture, or conduct."  *United States v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004) (en banc) (quoting *United States v. Griffin*, 530 F.2d 739, 742 (7th Cir. 1976)).  But it is valid only if given voluntarily, *Ohio v. Robinette*, 519 U.S. 33, 40 (1996), and whether consent is "'voluntary' . . . is a question of fact to be determined from the totality of all the circumstances."  *Schneckloth*, 412 U.S. at 227.

Police may also enter a private home where exigent circumstances exist, i.e., where an especially serious and time-sensitive law enforcement need requires it.  *See Payton*, 445 U.S. at 590; *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 298-99 (1967) (holding that exigent circumstances permitted a warrantless entry into a home where "delay in the course of an investigation . . . would gravely endanger [the officers'] lives or the lives of others").  A threat to the safety of a minor child within a home constitutes an exigent circumstance under at least some circumstances.  *Cf. Brigham City v. Stuart*, 547 U.S. 398 (2006) (holding that a warrantless

police entry did not violate the Fourth Amendment where officers standing outside a house witnessed a fight between a juvenile and four adults inside).

Although this legal background was well established at the time of the relevant events, we must consider the particular circumstances facing the officers to determine whether any constitutional violation occurred and, if so, whether they could reasonably have believed that their actions were consistent with clearly established law. *See Mullenix*, 136 S. Ct. at 308. We review the events on each date, crediting the facts shown by Smith and making every reasonable inference in her favor.

### 1. March 9, 2012

On the morning of March 9, a witness reported to a staff member at Jasmine's school that Smith appeared to be intoxicated and might not be able to care for her children. A report was made to the Ohio Department of Job & Family Services at 10:55 a.m., where an Intake Report was filed and assigned an "Intake Priority" level of 3.[6] Sometime before 1:20 p.m., according to the report, this information was relayed to the Wyoming police. In the meantime, Smith—who denies being intoxicated but admitted to "not feeling well that day"—was cooking dinner with her friend Renee Littles and waiting for Tiffany and Jasmine to come home from school. At roughly 3:20 p.m., Sergeant World and Officer Krummen knocked at the door. Littles opened the door, and the officers asked to speak with Smith. Littles replied that Smith was unavailable to speak with them. The officers persisted, even after Smith herself called out from the kitchen to say that she was unavailable. Within a few minutes, the officers stepped inside the house to find Smith. According to Smith's notes of her interview with Littles, taken later in preparation for trial, Sergeant World "stepped on inside of [the] door . . . [and] started talking loud saying he needed to talk to Glenda [Smith]."

Appellees argue, consistent with the district court's holding, that the officers had Littles' consent to enter the home. Appellees claim that "Ms. Smith offers no evidence to the contrary," suggesting that Smith has not raised a genuine issue of fact as to consent. We disagree. Smith has offered enough evidence to raise a genuine dispute of fact as to whether Littles invited the

---

[6]The record does not illuminate the significance of priority level 3.

officers inside. Though appellees' position is supported by Sergeant World's deposition testimony, Smith contradicts this with her own testimony.[7] The district court was not entitled to discount Smith's word even if it judged the officer to be more credible. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ."). Smith testified that she heard Littles tell the officers that she was not available, an account corroborated by her notes from the interview with Littles. Though it is possible that Littles invited the police to come in, but too softly for Smith to hear, we must view the facts in the light most favorable to Smith. Accordingly, we take as true that Littles and Smith both told the officers that Smith was not available to speak. Hence, on the record before us, we conclude that the officers had no consent to enter.[8]

Appellees argue in the alternative, again consistent with the district court's holding, that exigent circumstances justified their warrantless entry. As noted above, a threat to the safety of Tiffany—then 9 years old—could create exigent circumstances. The Supreme Court has held, for example, that the police lawfully entered a home when they saw a physical altercation involving a juvenile, giving them a reasonable basis for believing that the juvenile might be seriously injured or under imminent threat of injury. *Brigham City*, 547 U.S. at 400.

Here, however, the officers only knew that Smith was possibly intoxicated and unable to care for her children earlier in the day. We also may fairly infer that the officers did not treat the report of Smith's possible incapacity as an emergency. They did not arrive at Smith's house until two hours after they were notified of the threat of possible neglect. *See Gates v. Texas Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 422-23 (5th Cir. 2008) (finding no exigent circumstances where child services employees, after learning of alleged abuse at a child's home, went to lunch before conducting a "routine" home visit). Nor does the record show that the officers believed that Tiffany and Jasmine were at home and potentially in danger. Though the

---

[7]Evidently, neither Officer Krummen nor Littles were deposed.

[8]Given our conclusion, we need not decide here whether Littles had common authority over the house such that she could have given valid consent to enter. *See Matlock*, 415 U.S. at 170-71. We also need not decide whether Smith, calling out from the kitchen that she was not available to speak to the officers, effectively negated any consent that Littles might have given. *See Randolph*, 547 U.S. at 106. These issues could become important, however, depending on the facts as they are developed at trial.

officers arrived in the mid-afternoon, when school children often return home, that timing was the choice of the police. Giving Smith the benefit of all reasonable inferences, the evidence shows that the police perceived their task to be a routine check on Smith to ensure the welfare of her children.

On the facts developed thus far, taken in a light favorable to Smith, the officers violated her Fourth Amendment rights when they made a warrantless entry into her home on March 9, 2012. The Supreme Court has consistently validated the right to retreat into one's home and avoid contact with the police. *See, e.g., Welsh*, 466 U.S. at 748; *Payton*, 445 U.S. at 590. Any reasonable officer would have understood that to enter a private home after being expressly told the occupant could not speak with him, in the course of a routine child welfare check, flies in the face of this clearly established law. Qualified immunity does not protect the officers from liability for the constitutional violation under these circumstances. We therefore vacate the entry of judgment for the officers on this claim.

### 2. April 2 and May 2, 2013

We turn next to the claim that officers entered Smith's home unlawfully on April 2 and May 2, 2013. On both occasions, it is undisputed that the officers went to the house in response to 9-1-1 calls related to Tiffany's safety—on April 2 based on a call from Johnston about the presence of an unknown man in the house, and on May 2 based on Tiffany's call in which she claimed that her mother had threatened to kill her. On both occasions, Tiffany answered the door.

Significantly, both episodes began with a 9-1-1 call. We have found a call to emergency services highly relevant to the issue of exigency. *See Johnson v. City of Memphis*, 617 F.3d 864, 869-70 (6th Cir 2010).[9] The 9-1-1 system is intended to give callers a way to obtain police help expeditiously, and Johnston and Tiffany's use of the system reflects their belief that they needed immediate help. *See id.* Calling 9-1-1 also brings a degree of accountability. In many jurisdictions, including Ohio, misusing the system is a misdemeanor. *Id.*

---

[9]We did not suggest in *Johnson* that all 9-1-1 calls create exigent circumstances. We noted, for example, that the unreliable nature of anonymous 9-1-1 calls could change the analysis. 617 F.3d at 870.

There were also objective indications that Tiffany consented to the officers entering the house on both occasions.**10**  Smith does not dispute that Tiffany opened the door each time and did not affirmatively protest the police coming into her home.  Officer World testified in his deposition that he thought Tiffany had given him verbal consent on April 2, an assertion which Tiffany did not dispute in her deposition.**11**  On May 2, Tiffany was waiting outside the house and opened the door after the police arrived.  A reasonable officer could have inferred that Tiffany was afraid to wait inside and was welcoming the police into her home.  Officer Ballinger testified that Tiffany in fact explicitly invited him inside on May 2, though Tiffany, after claiming not to remember the details in her deposition, claimed on the errata sheet of her deposition transcript that she did not invite him in.  Tiffany does not claim, however, that she affirmatively objected to the officers' entrance, and both incidents must be understood in the context of Tiffany herself initiating the encounter (on April 2, via her father, and on May 2, using 9-1-1 directly).

The totality of the circumstances known to the officers on both dates made it objectively reasonable for them to believe, even if mistakenly, that they had authority to enter the house.  Accordingly, they would be entitled to qualified immunity even if Smith could show that their entrance was not justified by consent or exigent circumstances.  We therefore affirm summary judgment for defendants on the April 2 and May 2 claims, based on qualified immunity.**12**

---

**10**The law is not clear on the age when children have the authority to admit the police into their homes, but there is no established law preventing a 10-year-old from doing so.  The Supreme Court has suggested in dictum that even younger children may consent to officers entering at least some rooms of the house: "[A] child of eight might well be considered to have the power to consent to the police crossing the threshold . . . but no one would reasonably expect such a child to be in a position to authorize anyone to rummage through his parents' bedroom." *Randolph*, 547 U.S. at 112 (citation omitted) (internal quotation marks omitted).

**11**Sergeant World, when asked whether Tiffany told him he could come in, testified: "I don't recall.  I think she did."  Tiffany testified that she did not remember any details of the incident.

**12**Concluding that no constitutional violation occurred during these entries, the district court did not need to consider qualified immunity.  Although the court did not clearly explain its rationale, its opinion suggests that the officers had Tiffany's valid consent to enter on April 2 and again on May 2, and that exigency would have independently permitted them to enter on both dates.  Hence, we are affirming the grant of summary judgment on this claim on different grounds.

**3. December 7, 2013**

No police officer walked into Smith's home on December 7, 2013, though Officer Riggs did come to her door and conducted a "knock and talk" there. The subject was whether the bruise on Tiffany's head had been caused by Smith, as Tiffany claimed. Smith claims that she tried to shut the door while Officer Riggs was still there, but that he placed his foot in the doorway, briefly preventing her from closing it. The refusal to allow Smith to conclude the talk, by means of the officer's foot in the door, is the basis for this claim of unlawful entry. We consider whether, on Smith's version of the facts, Officer Riggs is protected by qualified immunity.

Knocking on the front door of a home in order to speak with the occupant—a so-called "knock and talk"—is generally permissible. *United States v. Thomas*, 430 F.3d 274, 277 (6th Cir. 2005). Though the threshold of a house is especially protected by the Fourth Amendment, *see, e.g., Welsh*, 466 U.S. at 748, and police may not gather information even from a person's front porch without authorization, *Florida v. Jardines*, 133 S. Ct. 1409, 1414-15 (2013), the police are authorized to conduct a "knock and talk" for as long as they have consent. *See Thomas*, 430 F.3d at 277. When that consent ends, so does police authority to continue the interaction. *See Kentucky v. King*, 563 U.S. 452, 469-70 (2011) ("[W]hether the person who knocks on the door and requests the opportunity to speak is a police officer or a private citizen, the occupant has no obligation to open the door or to speak. . . . And even if an occupant chooses to open the door and speak with the officers, the occupant need not allow the officers to enter the premises and may refuse to answer any questions at any time."); *United States v. Spotted Elk*, 548 F.3d 641, 655 (8th Cir. 2008) ("[A] police attempt to 'knock and talk' can become coercive if the police assert their authority, [or] refuse to leave."). When an officer coerces a person to answer his questions, or forces his way into a private home, he exceeds the scope of a consensual "knock and talk" and thus intrudes on Fourth Amendment rights.

Appellees argue that Officer Riggs's placing his foot in the door—a claim which they deny but we must accept for the purpose of the summary judgment analysis—was a limited

intrusion with a legitimate purpose, and thus was not a Fourth Amendment violation.[13] They adopt the view of the district court, which reasoned (without citation to authority) that "Officers are justified in 'knocking and talking,' . . . and making a minimal intrusion by preventing a door from closing in the course of an investigatory conversation." Appellees cite one case on this point: *United States v. Cosey*, No. 3:07-cr-0584-2-JAJ, 2008 WL 170417, at *4-5 (S.D. Iowa Jan. 18, 2008), where the court held that an officer serving process in connection with a civil forfeiture was justified in stepping inside an open door when the person to be served had not appeared after fifteen minutes.

*Cosey* is readily distinguishable from this case, both on its facts and because the court there relied on the principle that serving process on an occupant entitles police to enter a residence. *Id.* (citing *United States v. Frencher*, 503 F.3d 701 (8th Cir. 2007)). Appellees cite no case to support their contention that such a "minimal" intrusion into a home is permissible so long as it is in the service of a "legitimate objective." Indeed, with regard to the home, there is no *de minimis* exception to the Fourth Amendment. *See Kyllo v. United States*, 533 U.S. 27, 37 (2001) ("[T]here is certainly no exception to the warrant requirement for the officer who barely cracks open the front door . . . ."); *Silverman v. United States*, 365 U.S. 505, 512 (1961) (holding that an unauthorized intrusion only inches inside a home is "an actual intrusion into a constitutionally protected area").

However, we have found no cases holding that preventing the closure of the door to a home to briefly extend a consensual interview violates the Constitution. Smith cites no case law that clearly establishes this proposition. Surveying the opinions of our sister circuits, we have found only one—loosely—analogous case. In *Dalcour v. City of Lakewood*, the Tenth Circuit said that "based on the extensive Supreme Court . . . precedent emphasizing the significance of any physical intrusion into a home, a reasonable officer should have known that placing a foot into the doorway amounted to an entry of the home for Fourth Amendment purposes." 492 F. App'x 924, 934 (10th Cir. 2012) (unpublished).[14]

---

[13]Appellees do not claim that exigent circumstances justified placing a foot in the door.

[14]The Tenth Circuit permits the citation of unpublished decisions. 10th Cir. R. 32.1(A) (citing Fed R. App. P. 32.1). "Unpublished decisions are not precedential, but may be cited for their persuasive value." *Id.*

We disagree that existing Supreme Court precedent clearly establishes the law on this question. The relevant cases deal with intrusions that were unauthorized *ab initio*, not those that prolong an otherwise consensual encounter. *See Kyllo*, 533 U.S. at 37; *Silverman*, 365 U.S. at 512. And while an "occupant . . . may refuse to answer questions at any time" during a knock-and-talk, *King*, 563 U.S. at 470, Officer Riggs did not persist in questioning Smith after she attempted to close the door. Further, the facts of the Tenth Circuit case are starkly different from those here. In *Dalcour*, an officer kept her foot in the doorway of a home despite the occupant repeatedly attempting to slam the door shut, long enough for reinforcements to arrive. 492 F. App'x at 928. Here, by contrast, Smith's own deposition testimony shows that the entire encounter was consensual until Officer Riggs "put his foot in the door," causing Smith to "pause[] briefly," before Riggs removed his foot and allowed the door to close.

Hence, we need not decide whether a police officer briefly prolonging a consensual "knock and talk" by placing a foot in a doorway offends the Fourth Amendment. It is sufficient to hold that, even viewing the facts in the light most favorable to Smith, Officer Riggs did not violate clearly established law, and he therefore was protected by qualified immunity. Appellee was entitled to summary judgment on this claim.

**C. Smith's April 2, 2013 arrest for obstructing official business**

It is beyond debate that an arrest made without probable cause violates the Fourth Amendment. *See, e.g., Lyons v. City of Xenia*, 417 F.3d 565, 573 (6th Cir. 2005). Hence, to determine whether Smith was arrested for obstructing official business in violation of her constitutional rights, we must determine whether probable cause existed. "The test for probable cause is not reducible to 'precise definition or quantification.'" *Florida v. Harris*, 133 S. Ct. 1050, 1055 (2013) (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)). Probable cause is a "practical and common-sensical standard" based on "the totality of the circumstances." *Id.* Probable cause exists where the "facts and circumstances within the officer's knowledge [] are sufficient to warrant a prudent person . . . in believing . . . that the suspect committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979).

To set the stage for this inquiry, we revisit Smith's version of what occurred when the officers knocked on her bedroom door after entering her home to investigate Tiffany's concern about an unknown man. Her deposition testimony indicates that she complied immediately with Sergeant World's requests, except for a moment when World touched her unexpectedly:

> Q: How many times did Sergeant World ask you to open the door?
> A: Just once.
> Q: . . . Did you open the door?
> A: I did. . . . Once I opened the door, he said, is anyone else in there? I said, yes. He said, well, tell him to come out. I said, Robert, come on out. He came out. And I asked Officer World, I said, what's the problem? And he said, I ought to get you for resisting arrest, or something like that. . . . He's like, come on downstairs, and he grabbed my hand.[15] . . . When he grabbed my hand, I pulled my hand back. . . . I was in the hallway. . . . [H]e grabbed my hand when I asked him, why are you here?
> Q: When you pulled back from him, did he make any additional attempts to grab your hand?
> A: No.
> Q: He said, come on down here, and you walked down the stairs?
> A: Uh-huh, right.
> Q: At the bottom of the stairs he placed you in handcuffs?
> A: He did.

To determine whether these facts gave rise to probable cause, we must consider the particular crime for which the officers arrested Smith. *See Ingram v. City of Columbus*, 185 F.3d 579, 594 (6th Cir. 1999) ("To determine whether officers had probable cause to arrest an individual, we must look to the law of the jurisdiction at the time of the occurrence.").

Establishing a violation of Ohio's Obstructing Official Business statute, Ohio Rev. Code Ann. § 2921.31, requires proof of five elements: "(1) an act by the defendant; (2) done with the purpose to prevent, obstruct, or delay a public official; (3) that actually hampers or impedes a public official; (4) while the official is acting in the performance of a lawful duty; and (5) the defendant so acts without privilege." *Halasah v. City of Kirtland*, 574 F. App'x 624, 630 (6th Cir. 2014); *see also Patrizi v. Huff*, 690 F.3d 459, 464 (6th Cir. 2012) (identifying the same elements, but dividing them into three elements instead of five); *Lyons*, 417 F.3d at 573 (same).

---

[15]Despite Smith's phrasing in the deposition, it is undisputed that Officer Murphy grabbed her hand, not Sergeant World.

Ohio courts have emphasized the importance of the first element, the requirement that the defendant commit an affirmative act.  "A violation of [§ 2921.31] requires an affirmative act. A person cannot be guilty of obstructing official business by doing nothing or failing to act." *State v. Wellman*, 879 N.E.2d 215, 218 (Ohio 2007) (holding that the defendant acted when he "went beyond asking the officers questions and refusing to give his identification," and "actively prevented them from talking to [another] individual . . . by being belligerent and argumentative"); *accord Patrizi*, 690 F.3d at 464-66.

Probable cause could not have been based on Smith's words.  Ohio courts have not treated speech alone as an act for purposes of the statute.  *See Patrizi*, 690 F.3d at 464 ("To date, Ohio courts have affirmed obstruction convictions premised on true speech only when that speech involved yelling, cursing, aggressive conduct, and/or persistent disruptions after warnings from the police against interrupting the investigation.").  Hence, the only relevant affirmative act was Smith withdrawing her hand when Officer Murphy grabbed it.  Drawing all reasonable inferences in Smith's favor, this withdrawal may have been simply an involuntary reaction to an unexpected touch.  And, giving Smith the benefit of the doubt, she had no intention of obstructing the officers in their duties.  Nor did she delay them for more than a few seconds. After pulling her hand away, she walked downstairs as directed and did not resist being handcuffed.  In sum, on the facts as Smith relates them, her conduct did not provide probable cause to arrest her for obstructing official business in violation of Ohio law.  Hence, the officers arrested her in violation of the Fourth Amendment.

The district court reached a contrary conclusion on probable cause, citing *Lyons* but offering no analysis.[16]  In *Lyons*, we considered a Fourth Amendment claim based on an arrest under a city ordinance with the same elements as Ohio's obstructing official business statute. *See* 417 F.3d at 573.  We held that the police had probable cause with respect to every element of the statute.  *Id.* at 573-74.  The district court's pin cite points to our statement that "hostile or abusive speech that obstructs officers from fulfilling their duties *may* amount to a sufficient affirmative act to sustain a charge of obstructing official business." *Id.* at 574 (emphasis added).

---

[16]Only one sentence in its opinion addresses probable cause: "Similarly, the record supports a finding that Sergeant World reasonably believed Plaintiff was obstructing official business."

Yet in *Lyons*, "[t]he complete picture . . . include[d] more than just Lyons' refusal to provide information; it also include[d] profanity-laced yelling and finger-pointing at the officer, as well as the disruptive character of her speech—i.e., its volume, demeanor, etc." *Id.* at 575. These facts are starkly different from those in this case, at least on Smith's account.

Appellees offer only one case to support the proposition that probable cause existed. *See State v. Merz*, No. CA97-05-108, 2000 WL 1051837 (Ohio Ct. App. July 31, 2000). There the court upheld a conviction for obstructing official business where a defendant refused to provide identification to the officers, verbally abused them, and said he would physically resist if the officers attempted to restrain him. *Id.* at *1-2. Appellees argue that this case is like *Merz* because Smith "questioned the officers and . . . as the officers warned her that she needed to cooperate or face arrest, she pulled her hand away from an officer attempting to remove her." But the facts here are no more comparable to *Merz* than they are to *Lyons*. Most notably, Smith did not verbally abuse the officers or threaten physical resistance.

Turning to the clearly established law question, we must first ask whether the Ohio law defining obstruction of official business is clearly established. We conclude that it is. There has been no variation in the way the elements are defined. The relevant case law consistently requires an affirmative act, the purpose of obstructing a public official, and the result of actually obstructing an official. *See, e.g., Lyons*, 417 F.3d at 573. Similarly, it is well established that the affirmative act requirement is only satisfied by particularly obstructive acts, or what can fairly be characterized as "aggressive, boisterous, or unduly disruptive conduct." *Patrizi*, 690 F.3d at 466. Next, we must ask whether a reasonable officer, observing Smith's compliance and generally peaceful demeanor—again, Sergeant World described her as "very slow," "very apologetic," and "very flirtatious"—would have understood that he lacked probable cause to arrest her under the clearly established law of obstruction of official business in Ohio. We conclude that a reasonable officer would have so understood. Qualified immunity therefore does not shield the officers from liability on this claim.

**D. Excessive force**

Smith also appeals the district court's finding that the physical force used by defendants during the April 2 encounter did not constitute excessive force in violation of the Fourth Amendment. Specifically, she claims that Officer Murphy, in grabbing her hand, and Sergeant World, in handcuffing her and holding her arm to guide her to the patrol car, applied excessive force.

The doctrinal framework of excessive force claims is well settled. In analyzing such claims, "[w]e apply the Fourth Amendment's unreasonable seizure jurisprudence." *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 400 (6th Cir. 2009). That doctrine requires us to determine whether the degree of force exerted during a seizure—here, an arrest—was excessive under an "'objective reasonableness' standard." *Id.* at 401 (quoting *Kostrzewa v. City of Troy*, 247 F.3d 633, 639 (6th Cir. 2001)). This assessment involves "balancing the consequences to the individual against the government's interests in effecting the seizure," *id.* (quoting *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002)) (alteration omitted), and requires "a fact-specific inquiry based on the totality of the circumstances," *id.* The officers' objective reasonableness is gauged on what a reasonable officer would have done, given the knowledge he had at the time. *Id.*

We conclude that the summary judgment record would not permit a reasonable jury to find that Smith had established that her excessive force claim meets the requirements for a constitutional violation. To reach a jury on a claim that officers secured handcuffs too tightly, a "plaintiff must allege some physical injury from the handcuffing, and must show that officers ignored plaintiff's complaints that the handcuffs were too tight." *Lyons*, 417 F.3d at 576 (internal citation omitted) (citing *Burchett*, 310 F.3d at 944-45). Smith does not allege that she complained about her handcuffs being too tight. Although we suggested in *Lyons* that a plaintiff might be able to establish a handcuffing claim if there was "an obvious physical problem caused by the handcuffs," even absent a request to loosen them, *id.*, Smith has not shown such harm.

Nor do we find merit in the remainder of her claim. The heart of her argument is that, given the minor nature of the crime for which she was arrested, i.e., obstructing official business,

the force exerted was disproportionate and unreasonable. *See Graham v. Connor*, 490 U.S. 386, 396 (1989) (holding that assessing the reasonableness of force used during an arrest "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue"). Smith complains that the officers gripped her too tightly when grabbing her hand and guiding her to the patrol car. She claims to have suffered "severe" bruises that "lasted over a week" and "emotional distress." Under some circumstances, bruising alone can be sufficient to create a genuine issue of material fact that there was an injury sufficient to support an excessive force claim. *See Morrison*, 583 F.3d at 402-03.[17] Here, however, Smith's own deposition, even charitably construed, shows that the officers were not excessive in the amount of pressure they used:

> Q: And how do you believe the bruise on your right arm happened?
> A: Just from [Sergeant World] grabbing my arm at one point.
> Q: When did he grab your arm?
> A: While we were downstairs to go outside to the cruiser.
>
> . . .
> Q: How long did he grab your arm for?
> A: It wasn't long. It was just like a motion to go out to the cruiser. . . . He was like taking my arm to just go out to the cruiser.
> Q: Okay.
> A: But he — it wasn't long. It was just like a, you know, direction type of thing.
> Q: And at any point did you complain of having any injuries to any —
> A: No, I did not. Not to the officers, no.
>
> . . .
> Q: Did you ever see a physician or a doctor for any injuries that you believe occurred that day . . . ?
> A: No.

With her excessive force claim, Smith has not raised a genuine dispute of material fact that a Fourth Amendment violation occurred.

---

[17]*Morrison* involved alleged bruising caused by tight handcuffs, but the general principle is also applicable to the alleged excessive force used in grabbing Smith's hand and holding her arm to guide her to the car.

IV.

For the foregoing reasons, we <u>affirm</u> the district court's decision in part and <u>vacate</u> and <u>remand</u> in part.  Specifically, we vacate the district court's judgment on the claim of unlawful entry with respect to March 9, 2012 and the claim of unlawful arrest with respect to the events of April 2, 2013, and remand for further proceedings consistent with this opinion.  We affirm summary judgment for defendants on all other claims.  We affirm the denial of Smith's cross-motion for summary judgment.[18]

---

[18]Smith also appealed the denial of her cross-motion for summary judgment.  *See Searcy v. City of Dayton*, 38 F.3d 282, 289 (6th Cir. 1994) ("Where . . . an appeal from a denial of summary judgment is presented in tandem with an appeal from a grant of summary judgment, this court has jurisdiction to review the propriety of the district court's denial of summary judgment." (quoting *Garner v. Memphis Police Dep't*, 8 F.3d 358, 363 (6th Cir. 1993))).  We see no basis to disturb the district court's judgment on this issue.  In any event, Smith's arguments in support of her own motion are so cursory that they are deemed waived.