*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 06a0062p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

PHYLLIS MAY, Administratrix of the Estate of
Deborah Kirk, Deceased,

*Plaintiff-Appellant,*

*v.*

FRANKLIN COUNTY COMMISSIONERS, et al.,

*Defendants-Appellees.*

No. 05-3188

---

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 00-01081—John D. Holschuh, District Judge.

Argued: December 6, 2005

Decided and Filed: February 15, 2006

Before: MOORE, ROGERS, and McKEAGUE, Circuit Judges.

---

### COUNSEL

---

**ARGUED:** Tony C. Merry, VOLKEMA, THOMAS, MILLER, BURKETT, SCOTT & MERRY, Columbus, Ohio, for Appellant. Tracie M. Boyd, FRANKLIN COUNTY PROSECUTOR'S OFFICE, Columbus, Ohio, for Appellees. **ON BRIEF:** Tony C. Merry, VOLKEMA, THOMAS, MILLER, BURKETT, SCOTT & MERRY, Columbus, Ohio, for Appellant. Tracie M. Boyd, Patrick E. Sheeran, FRANKLIN COUNTY PROSECUTOR'S OFFICE, Columbus, Ohio, for Appellees.

---

### OPINION

---

KAREN NELSON MOORE, Circuit Judge. Deborah Kirk ("Kirk") was murdered by her boyfriend Marvin Moss ("Moss") in the early morning hours of August 14, 1998. During the conflict with Moss that culminated in her death, Kirk telephoned 911 three times, each time reaching one of the appellees in the Franklin County Communication Center ("Comm Center"). After Kirk's second call, appellees dispatched a police cruiser to her residence. The police officer who arrived at the scene did not hear any signs of a dispute within Kirk's apartment. When neighbors told the officer that they were not aware of any conflict inside the apartment, the officer cleared the call and left the scene. Unbeknownst to the officer, Moss was restraining Kirk inside the apartment, and their conflict continued after the officer left, with Moss eventually killing Kirk.

1

Appellant Phyllis May, the administratrix of Kirk's estate, filed suit in state court against, among others, appellees Franklin County, Franklin County Board of Commissioners, Sheriff Jim Karnes, Sgt. Earl Taylor, and Communications Technician ("Comm Tech") Marino A. Susi (referred to collectively as "Franklin County"). May's suit alleged a violation of 42 U.S.C. § 1983 as well as a wrongful death claim under Ohio law, and the case was removed to federal court. Advancing the "state-created danger" theory of state liability for private violence, May argued that the arrival and departure of the police without intervening in the conflict increased the risk of harm to Kirk, thereby violating her substantive due process rights. After discovery, appellees moved for summary judgment on all claims. The district court granted summary judgment on the federal claim, and remanded May's state-law claim to Ohio state court. Because we conclude that May has not produced evidence to show that Franklin County created or increased the risk that Kirk would be harmed, we AFFIRM the judgment of the district court.

## I. BACKGROUND

Unless specifically noted, the following facts are not in dispute. Deborah Kirk's relationship with Marvin Moss dated back to at least 1997. For much of their relationship, including early 1998, they lived together in Alabama, which was Moss's home state. In April 1998, the couple came to Columbus because Kirk's mother was sick with cancer. The couple lived with Brenda Sturgill, who was Kirk's aunt, for part of their time in Columbus. Sturgill reports that, although the couple argued, she did not see them physically fight. After Kirk got her own apartment in Columbus in late July 1998, the couple traveled back to Alabama to collect Kirk's things and return them to Columbus. While in Alabama, Kirk asked Moss to wait behind for a few days before rejoining her in Columbus. During his police interview after he turned himself in, Moss stated that he and Kirk had been having problems at that time because of his drug addiction. Moss hitchhiked his way back to Columbus on August 9, 1998, and stayed with Kirk in her Columbus apartment until he fled Columbus on August 14, 1998. Between August 9 and August 13, Moss and Kirk spent time alone but also with Kirk's friends and family.

Sometime on the night of August 13, 1998, Kirk and Moss began fighting while at Kirk's apartment. Kirk placed three calls to 911 during the altercation. The Franklin County Comm Center received the first call at 11:06 p.m., but after the call was answered Kirk's end of the line disconnected. Sgt. Taylor immediately called back Kirk's apartment. Kirk told Taylor that there was a domestic problem, but she thought that the situation was under control. In this call, Taylor did not ask Kirk any of the eight questions required by the Franklin County protocol for handling domestic violence calls. Kirk's conversation with appellees ended after Sgt. Taylor asked Kirk if the situation was "all taken care of," to which Kirk responded, "Yes sir. I hope so." Joint Appendix ("J.A.") at 1761-62 (Dispatch Tr. at 1-2).

At approximately 11:23 p.m., the Comm Center received a second call from Kirk's address. Comm Tech Susi, who was at that time unaware of the first call between Kirk and Taylor, answered Kirk's second call, which lasted approximately one minute and thirty-eight seconds. The call indicated to Susi that an altercation was in progress at the residence. May argues that "[i]t is obvious from the tape recording of this phone call that Kirk was being violently assaulted," Appellant Br. at 11, but appellees dispute that Susi was able clearly to discern what was happening. Appellees Br. at 6. Upon review, the transcript of the call clearly indicates that Kirk was being assaulted, that Moss was threatening to harm her further, and that Kirk was crying and was fearful. Susi testified at his deposition that during the actual call, however, all he could hear was a male voice and a female voice having a verbal argument. J.A. at 1506 (Susi Dep. at 29).

Susi filled out a cruiser "run card" after the second call, coding it as a "possible 20" (possible domestic disturbance) and assigning it a Priority 3, which is a mid-level priority used for domestic disputes where no violence is used or threatened. Susi took the run card to Dispatcher Lisa Birkhead

Clark, who dispatched a Franklin Township police cruiser to the scene on a "possible code 20" within seven minutes of receiving the run card. J.A. at 1764 (Dispatch Tr. at 4). At 11:31 p.m., the Comm Center received the third and final call from Kirk's residence, which Susi answered. During the nineteen-second call, Susi heard a low voice that he could not understand, and people yelling. Susi thought the call suggested the dispute was escalating, and so he stood up and got Clark's attention, and told her that the call was going to be a "good domestic" disturbance call fitting all the criteria. J.A. at 1511 (Susi Dep. at 34). Clark then relayed to Franklin Township Officer Ratliff, the officer in the dispatched police cruiser, that the Comm Center had received an additional call from Kirk's residence, and that the call was now "a good 20." J.A. at 1765 (Dispatch Tr. at 5). Ratliff acknowledged the dispatch and verified that he was en route to the scene. Susi did not change the call's priority code because the call had already been dispatched.

Officer Ratliff arrived at the scene at 11:37 p.m., six minutes after Kirk's third 911 call. Accompanied by a worker from the apartment complex, Ratliff went to Kirk's apartment and listened at the door, but he did not see or hear any signs of a struggle within the apartment. Ratliff knocked on Kirk's door but received no answer. After verifying with the dispatcher that he had the correct address, he knocked on nearby apartment doors, and was told by a neighbor one floor up that no sound of any disturbances had come from Kirk's apartment. After hearing nothing else from Kirk's apartment, Ratliff cleared the call with the Comm Center about ten minutes after his arrival.

The following day Deborah Kirk's body was discovered inside her apartment. The coroner later determined that Kirk died of "blunt trauma to neck." J.A. at 1813 (Coroner's Report). Moss fled Kirk's apartment the afternoon of August 14 and drove back to Alabama, where he turned himself in to police a few days later. He confessed to killing Kirk, and was transported back to Columbus. While being transported, Moss gave a taped statement to investigators about Kirk's death. Moss admitted, among other things, that on the evening of August 13, 1998, he and Kirk were drinking heavily and began arguing. The argument escalated into a pushing match, and Kirk hit Moss over the head with a lamp. Moss put his hands around Kirk's throat and pushed her over the bed, and the two fell to the floor. They were fighting on the floor when Moss heard Officer Ratliff arrive. Moss restrained Kirk while Ratliff was outside the door, and neither Kirk or Moss made a sound while the officer was outside. After the officer left, the two began fighting again. Kirk grabbed Moss by his genitals and "yanked real hard," and Moss slammed his hands "real hard" into Kirk's neck, killing her. J.A. at 1787 (Moss Interv. Tr. at 8). Moss was confined in Franklin County Jail from August 19, 1998 until February 3, 1999, when he hanged himself inside his cell before being tried or convicted of Kirk's death.

May filed this suit against appellees, asserting equal protection and substantive due process § 1983 claims, as well as a wrongful death claim under Ohio law. May abandoned her equal protection claim in the district court, and that issue is not involved in this appeal. May originally named Franklin Township, its Trustees, and Franklin Township Officer Ratliff (referred to collectively as "Franklin Township") as defendants along with the Franklin County defendants. Officer Ratliff filed a motion to dismiss based on qualified immunity grounds, which the district court denied in part. We reversed the district court's denial of qualified immunity to Ratliff. *May v. Franklin County Bd. of Comm'rs*, 59 F. App'x 786 (6th Cir. 2003) (granting Ratliff qualified immunity because, although his arrival and departure may have emboldened Moss, Ratliff's conduct did not shock the conscience or constitute deliberate indifference). May later settled her claims against the Franklin Township defendants, leaving only the Franklin County defendants. After discovery ensued, Franklin County moved for summary judgment on all claims, a motion that the district court granted on January 7, 2005. May filed a timely appeal.

## II.  ANALYSIS

May appeals the district court's grant of summary judgment to Franklin County on her § 1983 claim as well as the district court's remand of her state-law claim.

### A.  May's Substantive Due Process § 1983 Claim

#### 1.  Standard of Review

We review de novo a district court's grant of summary judgment. *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 933 (6th Cir. 2000).  Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Nevertheless, "[t]he mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Id*. at 252.  We are not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id*. at 249.

#### 2.  Establishing a Constitutional Violation

May argues that the appellees' actions on the night of August 13, 1998 "increased the risk of harm to Deborah Kirk, thereby depriving her of her Fourteenth Amendment substantive due process right to life and liberty."  Appellant Br. at 37.  May argues that the district court erred in its application of the test for state liability for private-actor violence that we established in *Kallstrom v. City of Columbus*, 136 F.3d 1055 (6th Cir. 1998).  May also argues that the district court failed to credit the testimony of May's expert witness that the appellees' conduct on that night increased the likelihood that Moss would seriously harm Kirk.  In order to prevail in her § 1983 claim against appellees, May must succeed on two separate issues.  First, she must establish that Kirk's harm was caused by a constitutional violation, and second, she must establish that appellees are responsible for that violation.  *See Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992).

##### a.  *Kallstrom*'s State-Created-Danger Theory of State Liability for Private Violence

The purpose of the Due Process Clause is "to protect the people from the [s]tate, not to ensure that the [s]tate protect[s] them from each other," and therefore the Due Process Clause cannot generally be used to hold the state liable for harms inflicted by private actors.  *DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 196 (1989).  *DeShaney* made clear, however, that its conclusion that there was no due process violation in that case did not reach circumstances where a person suffered injuries while in state custody or when state action made the person more vulnerable to private violence.  *Id*. at 201.  Therefore "while the state generally does not shoulder an affirmative duty to protect its citizens from private acts of violence, it may not cause or greatly increase the risk of harm to its citizens without due process of law through its own affirmative acts."  *Kallstrom*, 136 F.3d at 1066.  We refer to this exception to *DeShaney*'s no-liability rule for private action as the "state-created-danger" theory.  This is the theory upon which May relies in alleging a constitutional violation.

Interpreting *DeShaney*, we determined in *Kallstrom* that state liability for a state-created danger in violation of the Due Process Clause can be established if the plaintiff can show the three following factors:  (1) "affirmative acts by the state which either create or increase the risk that an individual will be exposed to private acts of violence"; (2) the victim faces "special danger," in that the "state's actions place the victim specifically at risk, as distinguished from a risk that affects the

public at large"; and (3) "[t]he state must have known or clearly should have known that its actions specifically endangered an individual." *Kallstrom*, 136 F.3d at 1066. As we have stated, "state officials may violate the Due Process Clause when their affirmative actions directly increase the vulnerability of citizens to danger or otherwise place citizens in harm's way." *Ewolski v. City of Brunswick*, 287 F.3d 492, 509 (6th Cir. 2002).

### b. Appellees' Actions Do Not Constitute State Action.

In order to prevail on her § 1983 substantive due process claim, May must satisfy *Kallstrom*'s first factor by showing that Franklin County took affirmative steps that either created or increased the risk of harm to Kirk. May argues here, as she did before the district court, that two County actions created or increased the risk that Moss would harm Kirk. First, May argues that Franklin County's act of dispatching Franklin Township Officer Ratliff to the scene of the altercation created or increased the risk of harm to Kirk. Second, May claims that the County's subsequent clearing of the police call at the scene without intervening in the dispute heightened the risk of harm to Kirk. Upon review we conclude that the district court properly rejected both of these purported affirmative acts.

#### i. Dispatching the officer to the scene was not an affirmative act under *Kallstrom*.

The district court found that dispatching the officer did not *create* the risk of harm to Kirk because the transcript of the 911 call indicates that Kirk and Moss were engaged in a physical confrontation before an officer was dispatched. Plaintiff's expert Dr. John Reid Meloy ("Meloy") agreed that even before the 911 call, Kirk was at a "high risk of being killed by Mr. Moss, primarily due to the fact that she was attempting to leave the relationship." J.A. at 1084 (Meloy Rep. at 4). Given this evidence, we agree with the district court's conclusion that the dispatch did not *create* the risk of harm to Kirk.

Whether the appellees' actions *increased* the risk of harm that Kirk faced from Moss requires more extensive analysis. The district court determined that no reasonable jury could find that the act of dispatching Officer Ratliff to the scene increased the risk of danger to Kirk. May argues that the district court erred because she claims that Dr. Meloy's report and deposition provide evidence that the police actions increased the risk of harm to Kirk. Meloy's theory is that the arrival and departure of the police without intervening emboldened Moss, thereby increasing the likelihood that he would kill Kirk. Meloy expressed his opinion that "[t]he police arrival at the scene of the violence, and the subsequent leaving without intervention, gave permission to Mr. Moss to escalate his violence" against Kirk. J.A. at 1082 (Meloy Rep. at 2).

In response, appellees argue that Meloy did not in fact provide evidence that the actions of Franklin County on the night in question increased the risk of harm to Kirk. Appellees suggest that May is being imprecise about Meloy's emboldenment theory and its relevance to May's allegation that the County's act of dispatching an officer to the scene increased the risk of harm to Kirk. For although May argues that the County's act of dispatching is an affirmative action under *Kallstrom*, her expert witness "*did not* opine that the act of dispatching increased the risk of harm." Appellees Br. at 24. We agree with appellees' precise analysis on this point.

Meloy did testify at his deposition that it is his opinion that Kirk's decision to seek help by calling 911 increased her risk of harm by escalating the situation. Meloy also testified that the act of the police officer knocking on the door and then departing may have increased Kirk's risk of harm because it encouraged Moss to believe that he could harm Kirk without any consequences or outside intervention. Meloy stated, "the overt behavior that introduces the aversive consequence initially appears to be the knock." J.A. at 991 (Meloy Dep. at 97). Meloy continued, "There was permission

given with the police arrival and their lack of an intervention and then their withdrawal." J.A. at 992 (Meloy Dep. at 98). Upon review of Meloy's deposition testimony and report, we conclude that appellees are correct that May *did not* present any evidence that appellees' decision to dispatch a police cruiser to the scene emboldened Moss, thereby exposing Kirk to greater harm. On the contrary, Meloy admitted during his deposition that, under his emboldenment theory, it was not the arrival of police that communicated permission to Moss, but rather the withdrawal of police that may have emboldened him. J.A. at 1014 (Meloy Dep. at 120) ("[T]he withdrawal is key to understanding the escalating dynamics in this case."). Thus even when we accept the testimony of plaintiff's expert, which we must do at the summary judgment stage, May has not produced any evidence that the appellees' act of dispatching an officer to the scene increased the risk of harm to Kirk.

May's request that we find state liability from Franklin County's dispatch of the officer also raises the "unavoidable liability problem" that is present in many state-created-danger cases involving imperfect or incomplete police rescues. In both *Cartwright v. City of Marine City* and *Bukowski v. City of Akron*, we discussed the "Catch-22" that these sorts of scenarios can create for police officers, where they face a danger of potential liability whether they take action to attempt a rescue or they fail to do so. *See Cartwright v. City of Marine City*, 336 F.3d 487, 494 (6th Cir. 2003); *Bukowski v. City of Akron*, 326 F.3d 702, 711-12 (6th Cir. 2003). Franklin County would undoubtedly face legal and moral objections, and rightly so, if its Comm Center personnel had failed to dispatch an officer to Kirk's apartment after her repeated calls to 911. May's proposition that appellees violated Kirk's constitutional rights by sending a police cruiser in response to her 911 calls for help is unsettling, and we decline to interpret the Due Process Clause in such a manner as to discourage law enforcement officers from responding to requests for assistance.

May has not produced any evidence that Franklin County's dispatch of police to Kirk's apartment created or increased the risk that Moss would harm Kirk. We therefore affirm the district court's conclusion that the dispatch is not an affirmative act under *Kallstrom*.

### ii.  Clearing the call was not an affirmative act by Franklin County.

The district court also rejected May's claim that the clearing of the call was an affirmative act that created or increased the risk of harm to Kirk, reasoning that it was Officer Ratliff's decision, not appellees' decision, to clear the call. Officer Ratliff is an employee of Franklin Township, not of appellees Franklin County. On appeal, May has not explained why Franklin County should be held liable for Officer Ratliff's decision to clear the call, nor does she dispute that it was Ratliff's decision to clear the call. Moreover, we previously granted Ratliff qualified immunity for his actions in this matter, *May*, 59 F. App'x at 794, and plaintiff has settled her claims against the Franklin Township defendants. We therefore affirm the district court's conclusion that the clearing of the call did not constitute a state action by appellees Franklin County under *Kallstrom*.

The inability of the Franklin County authorities to prevent Kirk's murder despite her numerous 911 calls to their emergency call center is deeply troubling. May has produced persuasive evidence that appellees failed to follow their established procedure for domestic violence calls when fielding Kirk's first 911 call, and that appellees may also have underestimated the urgency of Kirk's situation during the second 911 call. Had appellees attempted to obtain more information from Kirk during her phone calls to 911, it is possible that their attempt to intervene would have been more aggressive, and the tragic events of that night might have unfolded differently. While appellees' actions in response to Kirk's calls for assistance may not be faultless, none of appellees' actions directly increased Kirk's vulnerability to danger or placed her in harm's way. *Ewolski*, 287 F.3d at 509. May has been unable to show that any of appellees' actions constitute affirmative acts as *Kallstrom* requires to sustain her state-created-danger claim.

Because May has failed to establish a constitutional violation under *Kallstrom*, we need not address May's argument that the inadequacies of the Franklin County's Comm Center training policies constituted deliberate indifference. May has not shown that the appellees' conduct violated Kirk's constitutional rights, and therefore "there can be no § 1983 liability on the part of [Franklin County for a failure to train] as a matter of law." *Weeks v. Portage County Executive Offices*, 235 F.3d 275, 279 (6th Cir. 2000). We affirm the district court's judgment that Franklin County did not violate Kirk's substantive due process rights.

## B. May's State-Law Claim

May argues that the district court erred in remanding her state-law wrongful death claim. We review a trial court's decision to remand state claims to state court for abuse of discretion. *Loftis v. United Parcel Serv.*, *Inc.*, 342 F.3d 509, 513 (6th Cir. 2003). District courts have the discretion to dismiss pendent state law claims if all federal claims have been dismissed. 28 U.S.C. § 1367(c)(3). We have held that when we do not remand any federal claims for further consideration, there is "no utility in sending back to the district court a single issue that turns upon state law and which would be better resolved by the courts" of the state in question. *DePiero v. City of Macedonia*, 180 F.3d 770, 790 (6th Cir. 1999). The district court therefore did not abuse its discretion in declining to hear May's wrongful death claim, and we affirm its decision to remand the state-law claim.

## III.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment to appellees on May's § 1983 claim, and **AFFIRM** the district court's remand of the remaining state-law claim to state court.