NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0414n.06

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| PAMELA REILLY, Personal Representative, estate of Rosemarie Reilly, | ) | |
| | ) | |
| **Plaintiff-Appellant,** | ) | |
| | ) | **ON APPEAL** FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| OTTAWA COUNTY, MICHIGAN, a Municipal | ) | DISTRICT OF MICHIGAN |
| Corporation; CHRIS DILL, Sergeant, in his | ) | |
| individual capacity; COLLIN WALLACE, Police | ) | **O P I N I O N** |
| Officer , in his individual capacity; DENNIS | ) | |
| LUCE, Sergeant, in his individual capacity; | ) | |
| BRANDON DEHAAN, Captain, in his | ) | |
| individual capacity; SEAN KELLEY; | ) | |
| ERIC TUBERGEN, Officer, in his individual | ) | |
| capacity, | ) | |
| | ) | |
| **Defendants-Appellees.** | ) | |
| | ) | |

BEFORE: NORRIS, KETHLEDGE, and NALBANDIAN, Circuit Judges.

**ALAN E. NORRIS, Circuit Judge.** This appeal arises from the fatal shooting of Rosemarie Reilly ("Rosemarie") by her estranged boyfriend, Jeremy Kelley ("Jeremy"). Rosemarie's mother, Pamela Reilly, filed suit on behalf of her daughter's estate against Ottawa County, Michigan, and several officers employed by its Sheriff's Department whose actions, or lack thereof, allegedly contributed to Rosemarie's death. The amended complaint also named officers employed by the Grand Valley State University Police Department who interacted with

Rosemarie and, like their counterparts in the Sheriff's Department, allegedly increased the likelihood that Jeremy would harm her.[1]

Defendants filed motions to dismiss the complaint for failure to state a claim. Fed. R. Civ. P. 12(b)(6). Those claims include the following: 1) violation of Rosemarie's right to substantive due process under the Fourteenth Amendment; 2) a related *Monell* claim against Ottawa County; and 3) a wrongful death claim against certain individual defendants pursuant to Michigan law. (A fourth claim alleging a civil conspiracy has not been appealed.)

The district court granted the motions to dismiss as to all claims. It subsequently denied a motion to reconsider filed by plaintiff. This appeal followed.

**I.**

We review the grant of a motion to dismiss based upon Rule 12(b)(6) de novo. *Lipman v. Budish*, 974 F.3d 726, 740 (6th Cir. 2020). In doing so, we "must accept the factual allegations in the complaint as true and construe the complaint in the light most favorable to plaintiff." *Id.* (citing *Hill v. Blue Cross & Blue Shield of Mich.*, 409 F.3d 710, 716 (6th Cir. 2005)). With this precept in mind, the following summary tracks the allegations of the amended complaint.

Rosemarie and Jeremy were in a romantic relationship while she was a student at Grand Valley State University ("GVSU"). Although their relationship ended in September 2016, the couple continued to live together throughout the month. On October 1, Rosemarie confided in her mother that she wished to leave Jeremy.

---

[1] The amended complaint also named Sean Kelley, Jeremy's father, as a defendant. At the time of the shooting, he served as an officer in the neighboring Bloomfield Township Police Department. Plaintiff has abandoned her claims against him on appeal.

Things began to truly unravel on October 5, when Jeremy told Rosemarie that "he had a gun to his head and was going to shoot himself." Am. Compl. ¶ 20. Because she did not know where Jeremy was, Rosemarie called his father, defendant Sean Kelley, who then tracked his son's cell phone. In the process of locating Jeremy, Mr. Kelley spoke with defendant Collin Wallace and other officers employed by the GVSU police department. Once located, Jeremy was admitted to a local hospital.

The amended complaint alleges that, after his release, Jeremy "began stalking and harassing Rosemarie." Am. Compl. ¶ 23. He contacted her repeatedly on October 7 and led her to believe that he was going to attempt suicide for a second time. Rosemarie responded by staying with a friend and later at the house of her aunt and uncle, Noreen and David Rose.

The following day Rosemarie and her mother Pam met for lunch. Her mother noticed "that Rosemarie had a crooked nose and facial bruises, and Pam took Rosemarie to the hospital for treatment, where it was determined that she had suffered a broken nose." Am. Compl. ¶ 28. During a telephone call later that day, Jeremy admitted to Mrs. Reilly that "he had hurt Rosemarie." *Id.* ¶ 29. Rosemarie confirmed that statement in a call to her father, telling him that Jeremy would not let her leave their home and had "punched her in the face, arms, and legs several times, causing her broken nose among other injuries." *Id.* ¶ 30.

Over the next three days, Jeremy called Rosemarie 43 times. He also called her aunt and uncle repeatedly. On October 11, Jeremy called her uncle, Mr. Rose, at 11:10 p.m. and "threatened to kill himself, stating that he had a gun to his head." Am. Compl. ¶ 33. For his part, Mr. Rose called the Ottawa County Sheriff's Department ("OCSD") and reported the incident. An OCSD officer telephoned Jeremy but no further action was taken at that time.

3

The following day, October 12, Jeremy appeared at the GVSU campus and "jumped in front of Rosemarie's car before pounding on the window and head-butting her vehicle." Am. Compl. ¶ 36. Rosemarie responded by contacting the GVSU police and "report[ing] Jeremy for stalking, domestic violence/abuse, and for putting a gun to her head and threatening to kill her." *Id.* ¶ 37. She spoke to Officer Wallace who contacted the OCSD, which dispatched Sergeant Chris Dill to deliver paperwork to Rosemarie so that she could file an application for a Personal Protection Order ("PPO"). Sergeant Dill encouraged her to do so.

Meanwhile, Officer Wallace completed a "no trespassing" form barring Jeremy from the campus and prepared an incident report detailing the allegations of stalking. Like Dill, Wallace encouraged Rosemarie to obtain a PPO.

The following day, October 13, Officer Eric Tubergen of the OCSD followed up by visiting Jeremy and telling him to leave Rosemarie alone. He also called Mrs. Reilly and told her that "there was nothing that could be done to prevent Jeremy from calling Rosemarie, that he had seen Jeremy's guns and that Jeremy was legally allowed to own those guns, and that he was 'well aware' that Jeremy's father, Sean Kelley, was a police officer." Am. Compl. ¶ 43. When Mrs. Reilly responded by informing Tubergen that Jeremy had threatened to kill her daughter with a gun, he told her that "Rosemarie needed to file a report." *Id.* ¶ 45. Rosemarie followed up by reporting the incident to Sergeant Dill.

Thereafter, Dill telephoned Jeremy and told him that "he was not going to take Jeremy to jail despite his desire to question him regarding Rosemarie's complaint of domestic violence." Am. Compl. ¶ 47. Jeremy responded that he was "upset Rosemarie had called the police and he believed she had obtained a PPO at that time." *Id.* ¶ 48.

4

On the same day, October 13, Brandon DeHaan, a captain with the GVSU police, reviewed the reports prepared by Dill and Wallace. He also spoke with Mrs. Reilly who told him that "Jeremy had several guns and was very unpredictable, and that she was concerned about Jeremy's father, Defendant Kelley, offering Jeremy bad advice regarding the situation with Rosemarie." Am. Compl. ¶ 50. Captain DeHaan called Jeremy on the same day and told him that he was banned from GVSU property and was not to contact any of the Reilly family members.

On October 16, Mrs. Reilly called Dennis Luce, a sergeant with the OCSD, about retrieving Rosemarie's belongings from the residence that she had shared with Jeremy. An officer from the OCSD met Mrs. Reilly and her daughter at the trailer. Jeremy was also present. According to the amended complaint, "[t]he officer initially was not going to supervise Rosemarie's removal of her things [from] inside the trailer, was going to permit Jeremy and Rosemarie to be alone together while she removed her things, and only did so upon request of the Reilly's [sic]." Am. Compl. ¶ 59.

The following day, October 17, Rosemarie formally picked up the PPO, which prohibited Jeremy from "entering Rosemarie's residence, entering onto GVSU property, following Rosemarie, and contacting Rosemarie by phone or Facebook." Am. Compl. ¶ 60.

Unfortunately, the PPO did not have the desired effect. The very next day Jeremy called Rosemarie three times. Rosemarie reported those calls to Officer Wallace and let him know that Jeremy had stalked her by "entering onto the GVSU campus and following Rosemarie with his vehicle until she ran into a dining hall." Am. Compl. ¶ 62. Despite continued calls from Mrs. Reilly and Rosemarie, "no one attempted to arrest Jeremy." *Id.* ¶ 65. Moreover, "Jeremy told Rosemarie and Jennifer Reilly [Rosemarie's sister] that Jeremy's dad . . . had spoken to the local police and that 'nothing was going to happen' to Jeremy for violating the PPO." *Id.* ¶ 67.

5

On October 22, Rosemarie emailed Officer Wallace to let him know that, since the PPO had issued, Jeremy "had tried to contact her 86 times through her phone, left her multiple voicemails, and emailed her University email address on multiple instances." Am. Compl. ¶ 68. Finally, on October 28, OCSD prepared an arrest warrant and mailed it to Jeremy based upon Rosemarie's earlier report of domestic violence. Another warrant, this time based upon Rosemarie's complaint that Jeremy stalked her at GVSU, was mailed on November 2. When Jeremy told Mr. Reilly that he was aware of the arrest warrants, Mr. Reilly advised him to turn himself in.

> The tragic ending of this story occurred a few days later:
>
> [O]n or about November 6, 2016, Jeremy found Rosemarie at a friend's house located at 1450 Lake Dr. SE, Grand Rapids, MI 49605, and, at approximately 3:00 a.m., dragged Rosemarie from the residence by her hair, shot her multiple times in the torso with a black 9 mm Beretta pistol when she attempted to flee back into the house, then shot himself in the head.

Am. Compl. ¶77.

In addition to these specific allegations, the complaint also contains assertions of a more general nature: defendants allowed Jeremy to keep possession of a handgun despite their awareness that he had threatened Rosemarie with it; local police "listened and acquiesced to Jeremy's father when he requested leniency for his son," Am. Compl. ¶ 84; and defendants' regular communication with Jeremy strengthened his belief that nothing was going to happen. In sum, the actions of defendants "constitute an affirmative act that either created the risk or increased the risk of danger to Rosemarie Reilly placing her in substantial risk of serious immediate and proximate harm which was the cause of her death." Am. Compl. ¶ 90.

6

Prior to discovery, the defendants filed motions to dismiss for failure to state a claim. Fed. R. Civ. P. 12(b)(6). As already mentioned, the district court granted these motions and dismissed the complaint. It subsequently denied plaintiff's motion for reconsideration.

**II.**

1.  Due Process Claim

Plaintiff's allegation that the individual defendants violated her substantive right of due process under the Fourteenth Amendment lies at the heart of her appeal.

In *Lipman*, this court reviewed the history of the state-created danger component of due process:

> The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." In most cases, this means that the government must provide adequate procedural safeguards before it can restrict one of these rights. *Collins v. City of Harker Heights*, 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L. Ed. 2d 261 (1992). But some rights—referred to by the courts as fundamental rights—are so important that no amount of procedure alone will do. Rather, the state can only infringe upon these rights if its imposition "is narrowly tailored to serve a compelling state interest," a doctrine referred to as substantive due process. *Washington v. Glucksberg*, 521 U.S. 702, 721, 117 S. Ct. 2258, 138 L. Ed. 2d 772 (1997) (quoting *Reno v. Flores*, 507 U.S. 292, 302, 113 S. Ct. 1439, 123 L. Ed. 2d 1 (1993)). The right to life and safety through personal security is such a fundamental interest, and therefore is protected by the substantive portion of the Due Process Clause. *Youngberg v. Romeo*, 457 U.S. 307, 315–16, 102 S. Ct. 2452, 73 L. Ed. 2d 28 (1982).
>
> That said, the Constitution concerns the actions of government, not private citizens. And so, while the government cannot infringe upon a fundamental right without a compelling state interest, the state generally is not obligated to protect those rights against harm from private actors. That is the central holding of *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 197 (1989).

*Lipman*, 974 F.3d at 740—41. However, while "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause," there are "certain limited circumstances the Constitution imposes upon the State affirmative duties of care

and protection with respect to particular individuals." *DeShaney*, 489 U.S. at 197-98. These

"limited circumstances" apply in two situations: first, when an individual is in custody of the state;

second, when state actors contribute to the dangers posed by private persons to an individual.

*Lipman*, 974 F.3d at 741-42 (quoting *DeShaney*, 489 U.S. at 198—201). With respect to the latter

category, circuit courts, including ours, have interpreted this exception to *DeShaney* to comprise

situations where "the state acts to create or increase the danger of private harm: the state-created

danger doctrine." *Id.* (citing *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066-67 (6th Cir.

1998)).

In *Kallstrom*, we held that the City of Columbus placed its undercover police officers in

special danger by allowing violent gang members access to their personal information. In reaching

our holding, we provided this reasoning:

> Liability under the state-created-danger theory is predicated upon affirmative acts by the state which either create or increase the risk that an individual will be exposed to private acts of violence. As explained by the Seventh Circuit, "[i]f the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit." *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982). However, because many state activities have the potential to increase an individual's risk of harm, we require plaintiffs alleging a constitutional tort under § 1983 to show "special danger" in the absence of a special relationship between the state and either the victim or the private tortfeasor. The victim faces "special danger" where the state's actions place the victim specifically at risk, as distinguished from a risk that affects the public at large. The state must have known or clearly should have known that its actions specifically endangered an individual.

*Kallstrom*, 136 F.3d at 1066 (citations omitted). Since *Kallstrom* issued, this court has had

occasion to revisit state-created danger claims on numerous occasions. The legal parameters have

remained essentially the same, however; each case is extremely fact dependent. In appeals that

come to us via motions to dismiss prior to discovery, counsel's framing of the complaint's

allegations is critical. Although we review a complaint assuming its allegations to be true, they must make out a colorable claim: "A claim has facial plausibility when the plaintiff pleads factual content . . . that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

While we review the grant of a Rule 12(b)(6) motion to dismiss de novo, *Kaminski v. Coulter*, 865 F.3d 339, 344 (6th Cir. 2017), in our view the district court's opinion provides a balanced analysis of the question presented and we therefore quote it here at some length:

> As a threshold matter, many of the actions taken by Defendants—creating incident reports, giving the decedent paperwork, telling the decedent and Plaintiff to file reports, taking Plaintiff's phone calls, reviewing reports—are not acts that increased the preexisting danger to the decedent but are acts that arguably made her safer. And the remainder of the acts alleged by Plaintiff are insufficient to state a *DeShaney* claim.
>
> [A] failure to act is not an affirmative act under the state-created-danger theory. *See Engler* [*v. Arnold*], 862 F.3d 571, 576 (6th Cir. 2017). "This is so, even where officers can be seen not only to have ignored or disregarded the risk of injury, but to have condoned it." *Brooks v. Knapp*, 221 F. App'x 402, 407 (2007). And no "affirmative duty to protect arises . . . from the State's . . . expressions of intent to help" an individual at risk. *DeShaney*, 489 U.S. at 200. Accordingly, any alleged failure by Defendants to take Jeremy into custody, take away his firearm or otherwise fail to "follow up" is not actionable under § 1983.
>
> Similarly, under the caselaw, the alleged failure by GVSU Officer Wallace and/or the OCSD officers to personally serve the arrest warrants in this case is also not an affirmative act that states a plausible *DeShaney* claim. *See, e.g*, *Jones v. Union Cty.*, 296 F.3d 417, 430-31 (6th Cir. 2002) (failure to timely serve ex parte PPO on ex-husband was not actionable under *DeShaney*, even though "the Sheriff's Department was well aware of the seriousness of the domestic problems involving [p]laintiff and her ex-husband").
>
> Last, Defendants' conversations with Jeremy, notifying him of the decedent's report and/or telling him he was not going to be arrested, are also insufficient to state a *DeShaney* claim. *See, e.g.*, *Brooks*, 221 F. App'x at 406 (holding that the defendant-officers did not do anything "affirmative" to "embolden" the ex-husband by interrogating him but failing to arrest him on the night of the murder); *May v. Franklin Cty. Comm'rs*, 437 F.3d 579, 584-86 (6th

9

> Cir. 2006) (officers who merely depart from the scene of a domestic violence call without having taken steps to reduce the risk of harm cannot be held liable under the "state-created danger" exception to *DeShaney*).

(R. 62, Op. and Order, Page ID 436-37) (citations omitted).

On appeal, plaintiff argues that dismissal on the pleadings was premature; because the viability of state-created danger claims is particularly fact-dependent, discovery should have been permitted. *Lipman* took that approach and noted that "we must draw all reasonable inferences in favor of Plaintiffs when assessing whether the facts in their complaint demonstrate a state-created danger." 974 F.3d at 746 (citation omitted).

Plaintiff contends that her complaint pleaded "affirmative acts" on the part of individual defendants, which increased the danger to Rosemarie. First, they provided reassurances to Jeremy that he would not be arrested despite two existing warrants. Second, they "acquiesced" to a request for leniency made by Jeremy's father. Third, both the OCSD and GVSU officers mailed, rather than personally served, arrest warrants to Jeremy. Pointing to *Lipman*, where we determined that defendant social workers who interviewed an abused child in front of the alleged perpetrators committed an affirmative act that increased the danger to the child, plaintiff argues that her allegations are enough to survive the motions to dismiss: the question is whether one can plausibly infer that the defendant officers' actions increased Rosemarie's risk of harm from Jeremy.

Although we accept the amended complaint's allegations to be true in the context of a motion to dismiss, we conclude that they fall short of stating a colorable state-created danger claim. Chief Justice Rehnquist began his majority opinion in *DeShaney* with the simple statement, "The facts of this case are undeniably tragic." 489 U.S. at 191. Since that decision, which at least tacitly created a state-created danger component of the Fourteenth Amendment's Due Process Clause, nearly every decision contains similar language, usually in the context of denying a claim. This

appeal is no different. Clearly, the events that led up to Rosemarie's murder, which unfolded over the course of a month, could have been avoided. That said, plaintiffs who advance a claim of state-created danger face a high hurdle; they must show that the injured party was "safer *before* the state action than he was *after* it." *Lipman*, 974 F.3d at 744 (quoting *Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003)). This case involves inaction of the part of defendants, not actions that put Rosemarie at increased risk. In fact, the actions taken—advising Rosemarie to obtain a PPO, accompanying her to retrieve her belongings, advising Jeremy to stop contacting Rosemarie, and obtaining arrest warrants—were all appropriate. Essentially, plaintiff takes issue with defendants' failure to follow through in a timely and forceful manner. But since that does not identify an affirmative act that created a danger to Rosemarie that did not exist before defendants became involved, it cannot support a viable claim.

Finally, a few words about plaintiff's claim that the officers "emboldened" Jeremy by leading him to believe that "nothing was going to happen" to him and by failing to arrest him or take away his guns, which in turn led to Rosemarie's death. Am. Compl. ¶ 87. These assertions fall far short of alleging that the officers actually encouraged Jeremy to harm her by implying that he would be immune from prosecution should he do so. As explained above, a viable duty to protect claim would require that an *affirmative* act increased the chance that Rosemarie would be exposed to an act of violence by Jeremy. *Cartwright*, 336 F.3d at 493; *see also, Jones v. Reynolds*, 438 F.3d 685, 695—96 (6th Cir. 2006) (noting that plaintiffs who claim state actors "encourage[d] private illegal acts" still must show the "officers' *actions* either created or increased the risk of harm to [the victim]") (emphasis added). The facts as pleaded in the amended complaint simply fail to show, as they must, that defendants took any affirmative action that exposed Rosemarie to

any danger to which she was not already exposed. *Reynolds*, 438 F.3d at 696. That being so, her claim was properly dismissed.

2. Liability of Ottawa County

The second count of the complaint alleged liability on the part of Ottawa County based upon *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). Specifically, it alleged that policymaking officials failed to implement procedures to "protect individuals, such as Rosemarie Reilly, from individuals with violent tendencies or who had PPOs against them; . . . [and] from individuals against whom arrest warrants had been issued." Am. Compl. ¶ 104. The complaint also alleged failure to "establish, implement, and/or execute adequate policies . . . that ensured officers from different police departments—Defendant Kelley—could improperly influence investigations and/or police conduct." *Id.*

The district court recited these allegations and summarized the arguments of the parties before concluding:

> Given this Court's holding that Count I is properly dismissed, Count II is likewise properly dismissed. Moreover, Plaintiff fails to allege more than a single instance of a substantive due process violation like that alleged in this case. "A failure-to-train claim . . . requires a showing of prior instances of unconstitutional conduct demonstrating that the municipality had ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013). In short, Plaintiff fails to state a plausible *Monell* claim against Ottawa County.

(R. 62, Op. and Order, Page ID 440.)

Plaintiff understandably accords relatively little space to this assignment of error in her brief. Essentially, she concedes that, if we affirm the district court as to Count I, then her claim against the County fails. We agree that the district court correctly dismissed this claim and affirm on its reasoning.

12

3. Wrongful Death Claim

As mentioned earlier, the amended complaint also included a state-law claim for wrongful death, Mich. Comp. Laws § 600.2922, based upon the same facts alleged in the federal claims. The amended complaint alleged that defendants' actions were "intentional, wanton and willful, and/or grossly negligent and Defendants are therefore not entitled to government immunity under state law, MCL § 691.1407." Am. Compl. ¶ 113. Further, "Defendants' gross negligence was a proximate cause of the injuries, including the death of Plaintiff's decedent." *Id.* ¶ 114.

Michigan's governmental immunity statute shields a government official from tort liability when the official's "conduct does not amount to gross negligence that is the proximate cause of the injury or damage." Mich. Comp. Laws § 691.1407(2)(c).

The district court found for defendants on this issue based upon proximate cause:

> Michigan's wrongful death statute provides that
>
> > [w]henever the death of a person . . . shall be caused by wrongful act, neglect, or fault of another, and the act, neglect, or fault is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages, the person who or the corporation that would have been liable, if death had not ensued, shall be liable to an action for damages . . . .
>
> MICH. COMP. LAWS § 600.2922(1).
>
> Under Michigan's governmental immunity statute, however, an officer is immune from tort liability when the following three requirements are met:
>
> > (1) the officer "is acting or reasonably believes he or she is acting within the scope of his or her authority," (2) "[t]he governmental agency is engaged in the exercise or discharge of a governmental function," and (3) the officer's "conduct does not amount to gross negligence that is the proximate cause of the injury or damage."
>
> MICH. COMP. LAWS § 691.1407(2). The Michigan Supreme Court long ago defined "the proximate cause" as "the immediate efficient, direct cause preceding the injury." *Robinson v. City of Detroit*, 613 N.W.2d 307, 319 (Mich. 2000) (quoting *Stoll v. Laubengayer*, 140 N.W. 532, 534 (Mich. 1913)). The Michigan Supreme

13

Court has instructed that "a proper proximate cause analysis must assess foreseeability and the legal responsibility of the relevant actors to determine whether the conduct of a government actor, or some other person, was 'the proximate cause,' that is, as our caselaw has described it, 'the one most immediate, efficient, and direct cause' of the plaintiff's injuries." *Ray v. Swager*, 903 N.W.2d 366, 369 (Mich. 2017). As the Sixth Circuit has observed, "proximate cause is a high bar" under the statute. *Walker v. Detroit Pub. Sch. Dist.*, 535 F. App'x 461, 467 (6th Cir. 2013).

Plaintiff's pleading does not meet this high bar. As Defendants point out, Plaintiff expressly alleges in her Amended Complaint that the alleged conduct of Defendants was "a proximate cause," not the proximate cause of the decedent's injuries. And, viewing the Amended Complaint in the light most favorable to Plaintiff, accepting as true all well-pled factual allegations and drawing all reasonable inferences in favor of Plaintiff, "the one most immediate, efficient, and direct cause" of the decedent's injuries was clearly Jeremy's conduct, not any alleged actions or inactions by Defendants. *See* Am. Compl. ¶ 16 ("Rosemarie was shot and killed at approximately 3:00 a.m. on November 6, 2016 by her ex-boyfriend, Jeremy Kelley . . . ."). Plaintiff has therefore not pleaded a plausible wrongful death claim in avoidance of governmental immunity.

(R. 62, Op. and Order, Page ID 441-43) (citation omitted).

Plaintiff contends that dismissal of this cause of action on the pleadings was premature because gross negligence is a question of fact for a jury to determine. However, as the passage of the district court's analysis of this claim makes clear, it assumed that the actions alleged could constitute gross negligence and focused instead upon the proximate cause requirement.

On this point, plaintiff contends that the district court misread, or misapplied, *Ray v. Swager*, 903 N.W.2d 366 (Mich. 2017), by "weighing" factual causes. *Swager* held that a cross-country coach, who told his team to cross a street despite a no-walk signal, was not entitled to governmental immunity even though the driver of the vehicle that struck two team members was the immediate cause of the injuries. *Id.* at 378. By analogy, plaintiff urges us to view the facts of our case in a similar light: yes, it is undeniable that Jeremy was the direct proximate cause of Rosemarie's death; that does not mean, however, that defendants cannot be seen, like the cross-country coach, to be the proximate legal cause.

14

However, proximate cause means the one most immediate, efficient, and direct cause preceding an injury, and not simply a proximate cause. *Robinson v. City of Detroit*, 613 N.W.2d 307, 319 (Mich. 2000). No matter how one reads *Swager*, it explicitly affirms *Robinson*. *Swager*, 903 N.W.2d at 375. Clearly, as the district court stated, Jeremy's shooting of Rosemarie undeniably represents "the one most immediate, efficient, and direct cause of the plaintiff's injuries." *Id.* at 369 (quotation marks omitted). We therefore affirm the district court on this issue.

4. Supplemental Jurisdiction

Among the issues raised in her Rule 59(e) motion for reconsideration, plaintiff argued that the district court should have declined to exercise jurisdiction over her state law wrongful death claim pursuant to 28 U.S.C. § 1367. Section 1367 provides that courts "may" decline to exercise supplemental jurisdiction under certain conditions: the claim involves novel questions of state law; the state claim predominates over the federal claims; the court has dismissed the federal claims; or other exceptional circumstances provide a compelling reason to decline supplemental jurisdiction. 28 U.S.C. § 1267(c)(1)-(4).

The district court addressed plaintiff's argument in its Memorandum Opinion and Order denying the motion for reconsideration:

> This argument . . . does not provide a proper ground for reconsideration. "Arguments raised for the first time in a motion for reconsideration are untimely." *Evanston Ins. Co. v. Cogswell Props., LLC*, 683 F.3d 684, 692 (6th Cir. 2012). Further, the argument does not reveal a "clear error of law" or "palpable defect" where 28 U.S.C. § 1367(c) permits, but does not require, a court to decline to exercise its supplemental jurisdiction.

(R. 68, Mem. Op. and Order, Page ID 511.) Given that the district court decided this entire matter on the pleadings, plaintiff points out that she raised the issue at the first opportunity in her motion

for reconsideration. That said, all of the other factors weigh in favor of the district court's decision to retain jurisdiction.

Accordingly, we hold that the district court did not abuse its considerable discretion in exercising jurisdiction over the state-law claim.

**III.**

The judgment is **affirmed**.